48

THE LADISH COMPANY *v.* William BREASHEARS
et al

77-222                                        563 S.W. 2d 419

Opinion delivered March 6, 1978
(In Banc)
[Rehearing denied April 17, 1978.]

*Gilker & Swan* and *Richard D. Ries,* for appellant.

*Thelma M. Lorenzo,* for appellees.

CONLEY BYRD, Justice. William Breashears was making
$3.65 per hour as a drawbench operator, before appellant,
The Ladish Company and the Boiler Makers Union signed
an agreement on May 3, 1976. As a result of the union con-
tract, Breashears was paid $4.00 per hour retroactive to
March, 1976. Breashears pursuant to the union contract
would have received another $0.40 per hour in raises by the

first of the year. Sometime between May 3, 1976, and May 21, 1976, appellant decided that, due to economic conditions, it had to cut the second shift on which Breashears worked. Appellant offered the other employees other employment with one drop in classification. However, with respect to Breashears and Roger Trusty, both drawbench operators, appellant proposed to drop them two classifications to production processing work at a wage rate of $3.50 per hour. There were no wage increases for a production processing worker at $3.50 per hour. Breashears did not recall anyone telling him that when production picked back up, he would be put back on the drawbench. Breashears told appellant "I would rather draw unemployment and haul hay ever now and then, because I would be better off doing that than making $3.50 an hour and that while I was drawing unemployment I would be able to look for another job."

The Board of Review found that Breashears left his job because of reduction in pay and a reclassification to a lower level. The Board of Review then concluded that this caused the work to become unsuitable and that Breashears left his last work for good cause within the meaning of Ark. Stat. Ann. § 81-1106(a) (Supp. 1975). The circuit court affirmed the action of the Board of Review in awarding unemployment benefits.

For reversal, appellant here contends the circuit court erred as a matter of law in upholding the Board of Review's finding that Breashears had good cause to voluntarily leave the proffered work. In making this contention, appellant candidly admits that the resolution of the case rests with the determination of whether or not the job offered Breashears was suitable. Appellant points to Ark. Stat. Ann. § 81-1106(c)(1) (Supp. 1975), which provides:

"(1) In determining whether or not any work is suitable for an individual and in determining good cause for voluntarily leaving his work under subsection (a) of this section, there shall be considered among other factors, . . . the degree of risk involved to his health, safety and morals, his physical fitness and prior training, his experience and prior earnings, the length of time of his un-

employment, his prospects for obtaining work in his customary occupation, the distance of available work from his residence and prospects for obtaining local work.''

When we consider that the findings of the Board of Review must be affirmed on appeal when supported by substantial evidence, we conclude that there was substantial evidence to support the finding by the Board of Review. In addition to the testimony set forth above, which has been stated in the light most favorable to the Board's finding, the testimony also shows that the union representative told Breashears that he should have been dropped only one classification and that Breashears then would have received $3.75 per hour.

Appellant makes much of the fact that the $0.50 reduction would have amounted to only a 12½% reduction in wages. In making this contention appellant ignores the fact that Breashears in approximately six months would have been earning $4.40 per hour as a drawbench operator and that the difference between that wage and the $3.50 per hour as a production process worker would have amounted to $36.00 per week. As pointed out in *Dubkowski* v. *Administrator, Unemployment Compensation Act,* 150 Conn. 278, 188 A. 2d 658, 97 A.L.R. 2d 1120 (1963), ''Before work calling for less competence and lower remuneration can be found to be suitable, a claimant is entitled to a reasonable length of time within which to find work at his higher skill.''

Affirmed.

HARRIS, C.J., and HICKMAN and HOWARD, JJ., dissent.

CARLETON HARRIS, Chief Justice, dissenting. I cannot agree with the decision of the majority. In the first place, it does not appear that the Board of Review considered any factors other than the reduction in pay and the reclassification to a lower level, while Ark. Stat. Ann. § 81-1106 (c) (1) (Supp. 1975), provides various other requirements that shall be considered, as follows:

"(1) In determining whether or not any work is suitable for an individual and in determining good cause for voluntarily leaving his work under subsection (a) of this section, there *shall* [my emphasis] be considered among other factors, . . . the degree of risk involved to his health, safety and morals, his physical fitness and prior training, his experience and prior earnings, the length of his unemployment, his prospects for obtaining work in his customary occupation, the distance of available work from his residence and prospects for obtaining local work."[1]

That only the reduction in pay and reclassification were considered is clearly shown by the Board of Review decision which reads:

"The Board finds that the claimant left his job because of reduction in pay and a reclassification to a lower level. This caused the work to become unsuitable; therefore, the claimant quit with good cause connected with the work."

I submit that, under the evidence, these were not sufficient reasons to hold that the claimant quit with good cause.

First, the testimony was positive by James Zydzik, department head of tubular manufacturing, that Breashears was told that the transfer was temporary. Mr. Breashears does not deny this statement; he only says that he "doesn't remember" being so told. The reason for dropping the job classification two steps instead of one is not shown, and I do not know whether it was a question of seniority, or what, but I do know that the union did not file a grievance because of Breashear's transfer to other work, and appellee admitted that he did not ask the union to file a grievance. It would appear that this reduction was controlled by the collective

---

[1]The majority also mentioned this section, but after setting out these requirements, the court majority proceeds to ignore them, the first sentence thereafter in the opinion reading:

"When we consider that the findings of the Board of Review must be affirmed on appeal when supported by substantial evidence, we conclude that there was substantial evidence to support the finding by the Board of Review."

bargaining agreement, and the filing of a grievance would have been the proper procedure to follow. Instead of doing that, Breashears simply quit.

A number of cases from other states are listed in appellant's brief involving amounts ranging to reductions in wages frmm 12% to 50% where unemployment compensation was not allowed, and in others from 25% to 44%, which were allowed.[2]

Appellant states in its brief:

"In fact, no court in *any* jurisdiction has ever held that any reduction in wages of less than 25% was substantial enough to render work unsuitable. Should this Court now hold that the 12 1/2% reduction in the instant case was substantial enough to render the work unsuitable, Arkansas would become the most liberal jurisdiction in its application of Unemployment Compensation laws."

I have only made a cursory examination of the cases, but there is no contradiction of this statement.

Certainly, when we consider, other than the 50 cent reduction per hour in pay, the criteria set forth which the General Assembly has said *shall* be considered, the work appears entirely suitable. There is no evidence that the production processing job which Breashears was offered involved any risk to his health, safety or morals, and there is no evidence concerning the distance of available work from his home or prospects for obtaining local work in his customary occupation.[3] There would have been no change in his work-

---

[2]In *Dubkowski* v. *Administrator, Unemployment Compensation Act,* 150 Conn. 278, 188 A. 2d 658, the only case cited by the majority, three employees were transferred to lower rated jobs because of a slack in business and were reclassified from skilled work to unskilled. The first two, as well as being reclassified from the higher category, received a pay reduction of 28%, and the third a reduction of approximately 25%.

[3]It would certainly be most unusual if this worker could find similar employment as a drawbench operator, and, as a new employee, earn as much as he was earning with appellant company, or even as much as the offered employment. The appeals referee found that the rate of pay was above the prevailing wage in the area for this type of work.

ing hours and he had been engaged in production processing previously, and was qualified for the job.

One fact has made quite an impression on me, and that is reflected by the answer to a question propounded to Mr. Breashears on cross-examination as follows:

> "Buehgler: O.K. and did you also not make the statement that you'd rather draw unemployment and haul hay ever now and then; that you could be better off doing that?
>
> Claimant: Than making the $3.50 an hour, yes sir."

Mr. Breashears subsequently attempted to minimize or modify this statement by saying that while drawing unemployment he would also be able to look for another job. Of course, I do not know how he could haul hay and look for a job at the same time, but it is certainly very clear that he voluntarily ended his employment solely because of the pay decrease.

I thoroughly agree with the purposes of the Unemployment Compensation Act, set out in the declaration of state public policy as follows:

> "Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this State. *Involuntary* [my emphasis] unemployment is therefore a subject of general interest and concern which requires appropriate action by the Legislature to prevent its spread and to lighten its burden which may fall with crushing force upon the unemployed worker and his family. . . . The Legislature, therefore, declares that in its considered judgment the public good, and the general welfare of the citizens of this State require the enactment of this measure, under the police power of the State, for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed *through no fault of their own.* [My emphasis.]"

54

When, because of economic reasons, a company is forced to "cut back," and a worker is offered a job at only 50 cents an hour less than he had been drawing (and this reduction only temporary), has the same work hours, is familiar with the duties, and there is no additional safety risk, that worker has no legitimate reason to quit. In other words, he is not *involuntarily* unemployed, and I would deny unemployment benefits.

It follows that, in my view, the Board of Review having failed to consider any of the criteria mentioned other than the reduction in pay and classification, there was not substantial evidence to support the decision.

I would reverse.

I am authorized to state that HICKMAN and HOWARD, JJ., join in this dissent.